INDIANAPOLIS ROLLING-MILL CO. *v.* ST. LOUIS, F. S. & W. R. CO.[1]

*(Circuit Court, D. Kansas. 1886.)*

1. CONTRACT—RELEASE FROM CONTRACT—AUTHORITY OF OFFICERS.
    A by-law of the plaintiff corporation gave the superintendent, with the approval of the president of the company, authority to buy and sell material, and make all contracts for the same, and for work, etc. These officers made a contract for furnishing a large quantity of iron rails to defendant company. After a part performance the purchaser became embarrassed and unable to meet its payments, and in consideration that a third party who had no funds of the debtor, and was under no obligation to make the payment, would pay certain past-due drafts held by the plaintiff against the defendant, the said superintendent and president and treasurer of the plaintiff agreed to, and did, on such payment, release the defendant from said contract, and all damages for a breach thereof. *Held,* that the acts of those officers were within the scope of their authority; that the payment by the third party was sufficient consideration for the release; and that the same was valid and discharged the defendant.

2. SAME—EXECUTION OF BOND—BY-LAWS.
    Where a by-law provided that the superintendent of the company and all other persons should be subject to the control of the board of directors, in everything where the board *shall elect to exercise such control,* and the board did not elect to interfere with or control the contract for the sale of iron rails to defendant, nor did the board, after full knowledge of all the facts concerning the said release, elect to repudiate the same until several months afterwards, *held,* that the board must be presumed to have waived its right of interference, and consented to the action of its officers.

At Law.

*Wilson, Dunn & Dunn, T. P. Fenlon,* and *Warner & Dean,* for plaintiff.

*J. H. Richards* and *Rossington, Smith & Dallas,* for defendant.

FOSTER, J., *(orally.)* There are two principal objections urged by the plaintiff rolling-mill company against the validity of the release that is set up here by the defendant railroad company. The first objection that is urged by the plaintiff company is this: That the release which was executed by Mr. Thomas in New York, as treasurer of the rolling-mill company, was and is absolutely void by reason of the want of authority to execute the same. It appears from the evidence that that release was executed in pursuance of a telegram received by him from Mr. Jones, the president of the rolling-mill company. In the telegram he also recites that two other of the directors of the company concurred with him in consenting to this release; hence this release was made by the consent of Mr. Thomas, the treasurer, Mr. Jones, the president, and two other directors of the company. Now, it is claimed that under the by-laws of this corporation, the rolling-mill company, this release was and is absolutely null and void; and my attention has been called to by-law No. 4, in which it is provided that the superintendent shall have charge of the works, property, and operation of the company, and shall employ all operatives and certify all wages due and their expenditures to the secretary, who shall keep the records thereof, and draw an order on the treasurer for

[1] Affirmed. See 7 Sup. Ct. Rep. 542.

the payment thereof; and shall, with the approval of the president, buy and sell material, and make all contracts for the same and for work.   He shall report once each month, etc.   Now, in this case, Mr. Jones was both president and superintendent.   Under this by-law he had the power to buy and sell materials, and to make all contracts for the same, etc.   And it appears from by-law No. 6 as follows: "The superintendent, and all other persons, shall, in all cases, be subject to the control of the board of directors in everything where the board shall elect to exercise such control."   This original contract between the rolling-mill and the defendant, by which the rolling-mill company sold this large amount of iron, was made by the president of the company, and the board did not choose to exercise any control or management over it.   The extensions of the payment of these drafts or acceptances, which were drawn at different times, —the $85,000 and $54,000 drafts,—were made by these officers.   The board of directors did not choose to exercise any control or management over it.   This contract of release, because it is a contract,—and where he has authority, under by-law No. 4, to make all contracts concerning the buying of all material, and so on,—I take it is amply broad enough to permit him to modify any contract made, to change any contract made, and to release any contract made.   It would be a very restricted and narrow construction to take any other view of the powers therein conferred and granted.

It is argued here that this is a disposition of the assets of the company.   Well, supposing that the rolling-mill company had made a contract that was very disadvantageous to it; that it was losing money by carrying it into force and effect,—then would it be argued that this rule would apply if it was releasing what would be a good contract, but would not apply if it was releasing the company from a contract under which it was bound to lose money?   If this authority exists, it must exist as to releasing a contract, whether it be a good or a bad one for the plaintiff company.

Now, this release was made in New York.   Mr. Thomas states that he made his report before the board of directors some day in March. It appears from the minutes of the proceedings of the board at that time that no conclusion was arrived at, and no action was taken upon it.   One thing is certain upon that record: the board did not elect to exercise the control given them under by-law No. 6 at that time, for they did not repudiate it.   The record says they took no action upon it; but Mr. Thomas says the action that really was taken was in substance this: to take the legal advice of counsel, and act upon that; and not until some two years afterwards does the record of the plaintiff company show a repudiation, in terms, of this release, although suit had been brought in the June following the March of which it was first laid before them.   Now, if the board of directors of this company should elect to exercise the control which was given them by by-law No. 6, they must act promptly.   They could not play

fast and loose. They cannot say those officers have the power to make a contract, and, if it is good for the company, we won't exercise any control over it, but if they make a contract, and if it is to the disadvantage of the company, we will reserve the right to act upon it, although it may be years afterwards. They cannot do that. · If they elected to act upon that release, and repudiate it, they should have acted promptly, and within a reasonable time after full knowledge of all the facts was laid before them. But it appears from the evidence in this case that they did not do it. All that they ever did before this suit was brought was to agree to be governed by the advice of their attorney in the matter; hence I see nothing in the case to sustain the claim that this release was made without authority. It was made by the officers who made the contracts, and this board of directors never did elect to overrule or control the action of these officers, either in making the contract or releasing the contract; hence they acted as the by-laws provided they might act.

The next question is in reference to the matter of sufficient consideration to sustain this release. *First*, we have to look at the facts briefly as to the *status* of the parties at that time. It appears that these acceptances of $54,000 matured on the seventh day of February, 1883. It is very clearly shown by the evidence in this case that the railroad company, the defendant in this case, had made an error as to when these acceptances really fell due. The error had got into their books through a mistake of the predecessor of Mr. Dowland, the present auditor, and the railroad company was going under the assumption that these acceptances did not fall due until March. That is material in this view of the case. It is evident to my mind that no provision whatever had been made by the railroad company with Moran Bros. to meet these acceptances at the time that they really fell due,—no provision whatever. It appears from the statement of Mr. Moran and the testimony of Mr. Dowland that on February 1st the railroad company were indebted to Moran Bros. for something like $6,000; that is, not taking into consideration the $165,000 in bonds which had been sent to Moran Bros. expressly pledged to meet the $170,000 draft drawn in favor of the Missouri Pacific Railway Company. I say, not taking into account those bonds, and the draft drawn against them for which they stood pledged, the evidence in this case shows that the railroad company was indebted to Moran Bros. over $6,000. Now, to show that the railroad company were in error as to when these acceptances fell due, I refer to the cross-examination of Mr. Moran, on page 23, in which he reads from a letter which he wrote to Mr. Chenault on the fifth of February. After urging upon him the necessity of obtaining this release from the Indianapolis Rolling-mill Company of the old railroad company contract as a consideration, he says: "Of the payment of the drafts which mature on the *fourth of March* next, so as to prevent any difficulty or litigation thereafter." At that time it appears from this letter that he wrote

to Mr. Chenault that he was under the impression that these accept-ances did not mature until March, and he wrote that letter on the fifth day of February; so it is not at all likely that it was manufact-ured for the purpose, because at that time there seems to have been no trouble or contest.    Then he quotes in his cross-examination from a letter from Mr. Chenault.    It reads as follows:

"Thomas is correct.    The books as turned over to us show date to be the seventh of March, but investigation through Mr. Tiernan shows it to be Feb-ruary.    This error takes us by surprise.    The notes must not go to protest, but we must have a few days to consult with Hayes and others before an-swering you as to what is to be done.    Please assist us to get Thomas to wait, or advise us what to do.

[Signed]                          "WILLIAM CHENAULT, Treasurer.
                                  "J. H. DOWLAND, Auditor."

Now they refer to consulting with Hayes.    That has another im-portant bearing in this case.    Why consult with Hayes?    It goes to corroborate the testimony of Mr. Moran and Mr. Dowland that the $165,000 bonds were absolutely pledged for the payment of the draft, and Mr. Hayes was one of the chief officers of that company.    They wanted time to consult with him to see, as they testify, if they could not get him to release his claim upon this amount so that this draft might be met.    In another place he says:  "On the tenth of Febru-ary we received a telegram dated the ninth of February from Mr. Chenault, as follows:  'I agree with you in the matter of canceling rolling-mill contracts.'"    Now that was received on the 10th and dated on the 9th, and that was after the release had been made.  "I go to St. Louis to see what we can get Hayes to do.    In the mean while, what do you think of probability of borrowing enough money to pay this all off?"    These are extracts from a telegram sent by Chenault and Dowland to Moran, dated eighth February, in which also appear these words:  "Hayes is on his way back to St. Louis, where our president and treasurer will meet him.    Meanwhile, he requests us to ask you to assist in having the rolling-mill drafts extended.    At any rate, please put them off until our parties telegraph you from St. Louis. Answer about getting extension."

This evidence convinces me beyond any manner of doubt that this $165,000 was absolutely pledged for the payment of that Missouri Pacific draft of $170,000.    All the correspondence between the par-ties, the telegrams, letters, the statement that they were taken by sur-prise, go to show that they supposed that they had to make no pro-vision for the meeting of these $54,000 drafts until March.    Hence, although Moran Bros. were in one sense the financial agents of the railroad company, it is very clear that no provision had been made for meeting this $54,000, and it is equally clear to my mind that they had no funds of the railroad company in their hands at that time ap-plicable to the payment of those particular drafts.    The fact that they were the agents to sell their bonds did not impose any obligation upon Moran Bros. to take up these drafts and acceptances, unless they had

funds to do it with; and Moran, as Mr. Thomas says himself, said: "We haven't got a dollar of their funds in our hands." So the rolling-mill company, or its officers, was informed of just the *status* of affairs; and the testimony in this case satisfies me that that was in reality the fact.

So I conclude in this case, from the facts, that no legal liability rested upon Moran Bros. to pay the acceptances of the railroad company. The company had made no provision for meeting them at the time they fell due. That Moran's paying these acceptances under the circumstances was a sufficient consideration to sustain the release which was given in consideration of their paying the acceptances, and even if they were acting as the absolute agents of the railroad company, I am not prepared to say that in such a case there would not be a sufficient consideration to support the release. It appears that the railroad company at that time was absolutely insolvent; that it had an indebtedness of over $600,000, with between two and three hundred thousand dollars of assets. With the probabilities existing at that time of litigation to collect these drafts against the company, and from these facts, that the holders of these drafts were pressing the rolling-mill company, and these gentlemen who indorsed them were threatened with litigation, I am not prepared to say but under the authorities, even if Moran Bros. were acting as their agents in this transaction, that, under the circumstances, there would have been a sufficient consideration to support this release, if Mr. Thomas was fairly placed in possession of all the facts.

There has been considerable said here about a statement made in a letter after this transaction had been closed, in which Moran speaks of there being a balance there of about $7,000 due the defendant. Of course he is speaking of the date from which he wrote that letter, and it is true, while he had made this statement on the eighth day of February, and had taken the responsibility of using, so to speak, a part of the security pledged to the Missouri Pacific, not hearing from Mr. Hayes in the mean time, that he did, in fact, then charge up to the rolling-mill company the payment of those drafts as of the 7th; and then he goes on to make a statement of an account; but the statement of that account very clearly, as the testimony shows, dates as a matter of fact subsequent to the eighth day of February, although it was entered as of a date prior to that time. In his letter to Chenault, of February 8th, he says:

"As Captain Hayes is absent, we determined to pay the fifty-four thousand dollar drafts of the Indianapolis Rolling-Mill Co., having obtained from that company a discharge of all claims against the railroad company for non-fulfillment of contract to purchase rails. We consider this an important thing, as they said they had lost $50,000 by non-fulfillment of the old contract, and felt sore because the railroad made no further purchases from them."

That goes to show that Hayes had not been reached to get his consent, and Moran had taken this responsibility himself. Hence I say

tl at, under this statement of facts, there was a consideration, in my opinion, sufficient to sustain that release. Moran Bros. did not misrepresent, as I can find from the testimony, any material facts to Mr. Thomas or the officers of the rolling-mill company as to their relations with the railroad company; and it further appears from the contract which was dated in December that they were not absolutely bound even to make advances upon these bonds. It was within their election. They might have said, under the contract: "We haven't a dollar that can be applied to these drafts, or the payment of the drafts, of the Missouri Pacific Company. We will not recognize our liability until we actually sell the bonds." That seems to have been their right under the contract, if they had chosen to take that position; so that, in any view of the case, I can find no legal obligation on these parties to pay those drafts; therefore that release, in my opinion, is a valid release, and it is decisive of this action.

Judgment will go for the defendant.